**FEDERATION OF HOMEMAKERS,**
Appellant,

v.

**Alexander SCHMIDT, Commissioner of Food and Drugs, et al.**

No. 74–2122.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 8, 1975.

Decided June 10, 1976.

Rehearing Denied Sept. 20, 1976.

James S. Turner, Washington, D. C., for appellant.

Richard A. Merrill, Chief Counsel, U. S. Food and Drug Administration, Rockville, Md., for appellees. Stephen H. McNamara, Associate Chief Counsel for Food, U. S. Food and Drug Administration, Howard S. Epstein, Asst. Chief, Consumer Affairs Section, Dept. of Justice, and Peter Barton Hutt, Chief Counsel, U. S. Food and Drug Administration, Washington, D. C., at the time the brief was filed, were on the brief for appellees.

Before McGOWAN, TAMM and ROBB, Circuit Judges.

Opinion for the Court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

The Food and Drug Administration (FDA) recently promulgated a regulation which, for the first time, attempted to define an imitation food subject to section 403(c) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 343(c) (1970). The appellants in this case challenge the new regulation as contrary to the terms of the Act and as arbitrary and capricious. We affirm the district court's finding that the regulation fulfills the objectives of the statute in question and is a reasonable exercise of the regulatory power of the FDA.

The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.* (1970), provides criminal penalties for adulteration or misbranding of any food. Section 403 lists several actions which constitute misbranding, including the failure to label imitation foods:

> 343. A food shall be deemed to be misbranded—
>
> .    .    .    .    .
>
> (c) Imitation of another food.
>
> If it is an imitation of another food, unless its label bears, in type of uniform size and prominence, the word "imitation" and, immediately thereafter, the name of the food imitated.

21 U.S.C. § 343(c) (1970). The statute, however, does not define the word "imitation" and, until promulgation of the challenged regulation, a definition had evolved only indirectly from infrequent cases involving the subsection.[1] While those cases present-

---

[1] One of the few cases dealing entirely with section 403(c) is *United States v. 651 Cases, More or Less, of Chocolate Chil-Zert*, 114 F.Supp. 430 (N.D.N.Y.1953), in which a frozen chocolate dessert containing no milk products was held to be an imitation of chocolate ice cream. In comparing the product to ice cream, the court suggested numerous factors bearing on imitation:

> It would seem that imitation is tested not by the presence or absence of any one element of similarity, but rather by the effect of a composite of all such elements. As indicated above, Chil-Zert is identical with ice cream in its method of manufacture, packaging and sale. It is similar in taste, appearance, color, texture, body and melting qualities. It has identical uses; its composition differs only from ice cream in the substitution of a cheaper ingredient; namely, vegetable oil in place of milk products. It is, therefore, something less than the genuine article chocolate ice cream. It is inescapable that the ordinary understanding of English speech would denominate it as an imitation of ice cream.

*Id.* at 432–33.

Most cases cited by either party arise under subsection 343(g) which prohibits marketing a product as a food for which a standard has been established by regulation unless the product conforms to that standard. *See, e. g., 62 Cases of Jam v. United States*, 340 U.S. 593, 71 S.Ct. 207, 95 L.Ed. 645 (1951) (nonconforming jam may be sold as imitation jam); *Federal Security Administrator v. Quaker Oats Co.*, 318 U.S. 218, 63 S.Ct. 589, 87 L.Ed. 724 (1943) (product not meeting either standards of farina or enriched farina may not be sold with label "Quaker Farina Wheat Cereal Enriched with Vitamin D"); *Libby, McNeill & Libby v. United States*, 148 F.2d 71 (2d Cir. 1945) (tomato catsup with preservative not listed in standard of identity is misbranded); *United States v. 856 Cases, More or Less, Labeled Demi*, 254 F.Supp. 57 (N.D.N.Y.1966) (standard of identity for margarine does not preclude manufacture of Demi imitation margarine as another butter substitute).

The imitation concept is also discussed in cases involving the Meat Inspection Act of 1970, which, similar to the Federal Food, Drug, and Cosmetic Act, provides in pertinent part:

> (n) The term "misbranded" shall apply to any carcass, part thereof, meat or meat food product under one or more of the following circumstances:
>
> .    .    .    .    .

ed no clear definition of an imitation food, they did illustrate the applicability of the labeling directive to both standardized and nonstandardized foods.[2] *See generally United States v. 651 Cases, More or Less, of Chocolate Chil-Zert,* 114 F.Supp. 430, 433 (N.D.N.Y.1953).

In early 1973, the FDA published notice of a proposed rulemaking regarding imitation labeling. 38 Fed.Reg. 2138–39 (1973). Eight months later, the FDA promulgated the new regulation, responding to comments from interested parties. In general,

> (3) if it is an imitation of another food, unless its label bears, in type of uniform size and prominence, the word "imitation" and immediately thereafter, the name of the food imitated;

21 U.S.C. § 601(n)(3) (1970). *See Generally Federation of Homemakers v. Butz,* 151 U.S. App.D.C. 291, 466 F.2d 462 (1972) (85% meat frankfurter is not "all meat"); *Armour and Company v. Freeman,* 151 U.S.App.D.C. 291, 304 F.2d 404, *cert. denied,* 370 U.S. 920, 82 S.Ct. 1559, 8 L.Ed.2d 500 (1962) (ham with water added is still a ham); *Swift & Company, Inc. v. Walkley,* 369 F.Supp. 1198 (S.D.N.Y. 1973) (meat-soybean sausage is imitation frankfurter).

Congress has not always elected to leave terms such as "imitation" to judicial and administrative definition. *See, e. g.,* definitions under trademark legislation, 15 U.S.C. § 1127 (1970) ("The term 'colorable imitation' includes any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive.").

2. Standardized foods are those for which the FDA has issued a standard of identity under 21 U.S.C. § 341 (1970):

> Whenever in the judgment of the Secretary such action will promote honesty and fair dealing in the interest of consumers, he shall promulgate regulations fixing and establishing for any food, under its common or usual name so far as practicable, a reasonable definition and standard of identity, a reasonable standard of quality, and/or reasonable standards of fill of container . . . .

According to the FDA, standards have been issued for about half the food supply. Appellee's Br. at ns. 14 & 18.

3. (4) Nutritional inferiority includes:

> (i) Any reduction in the content of an essential nutrient that is present in a measurable amount, but does not include a reduction in the caloric or fat content provided the food is labeled pursuant to the provisions of § 1.17, and provided the labeling with respect to any reduction in caloric content complies

the regulation defined an imitation food as one which "is a substitute for and resembles another food but is nutritionally inferior to that food." 21 C.F.R. § 1.8(e)(1) (1975). "Nutritionally inferior" is defined as having any reduction in the content of essential nutrients which constitute 2% or more of the Required Daily Allowance of protein or of listed vitamins and minerals.[3] The regulation also provides that a substitute food which is not nutritionally inferior must have a label with a common or usual name [4] or a descriptive term.[5]

> with the provisions applicable to caloric content in Part 125 of this chapter.
>
> (ii) For the purpose of this section, a measurable amount of an essential nutrient in a food shall be considered to be 2 percent or more of the U.S. RDA of protein or any vitamin or mineral listed under § 125.1(b) per average or usual serving, or where the food is customarily not consumed directly, per average or usual portion, as established in § 1.17.

21 C.F.R. § 1.8(e)(4)(i), (ii) (1975).

4. General principles regarding common or usual name appear in 21 C.F.R. § 102.1(a), (b) (1975):

> (a) The common or usual name of a food, which may be a coined term, shall accurately identify or describe, in as simple and direct terms as possible, the basic nature of the food or its characterizing properties or ingredients. The name shall be uniform among all identical or similar products and may not be confusingly similar to the name of any other food that is not reasonably encompassed within the same name. Each class or subclass of food shall be given its own common or usual name that states, in clear terms, what it is in a way that distinguishes it from different foods.
>
> (b) The common or usual name of a food shall include the percentage(s) of any characterizing ingredient(s) or component(s) when the proportion of such ingredient(s) or component(s) in the food has a material bearing on price or consumer acceptance or when the labeling or the appearance of the food may otherwise create an erroneous impression that such ingredient(s) or component(s) is present in an amount greater than is actually the case.

5. A descriptive term is a name which modifies a common name by providing additional information about the product, *e. g.,* "artificially sweetened" or "vitamin D enriched." Nutritionally enriched goods are also subject to the labeling requirements of 21 C.F.R. § 1.17 (1975). Under the new regulation, foods may also use fanciful names. Widespread use of

The Federation of Homemakers, a national consumer group,[6] filed suit to enjoin enforcement of the new definition by the FDA, but on cross motions for summary judgment, District Judge Joseph C. Waddy held that the regulation is consistent with the statute and Congressional intent. *Federation of Homemakers v. Schmidt*, 385 F.Supp. 362 (D.D.C.1974). This appeal followed, with plaintiff-appellants arguing that the regulation is contrary to statute as well as arbitrary and capricious. For the reasons discussed herein we affirm the trial court's judgment.

■ In its explanation of the argument that the regulation contravenes the statute, the Federation of Homemakers relies on many cases in which judges have discussed, in both holdings and dicta,[7] the characteristics of imitation foods. Beginning with the Supreme Court's admonition in *62 Cases of Jam v. United States*, 340 U.S. 593, 599, 71 S.Ct. 515, 519, 95 L.Ed. 566 (1951), that "imitation" must be "left . . . to the understanding of ordinary English speech," appellants call our attention to cases in which texture, smell, taste, appearance, manufacture, packaging and marketing all contribute to a determination of whether the food in question must be labeled an imitation.[8] While it is true that these judicial definitions may be reasonable ones, we do not believe that they prevent the promulgation of an equally reasonable definition by the agency charged with administering the Act. Congress chose not to define the parameters of its imitation label

requirements; our deference to the enforcing agency's interpretation limits our review to determining only whether the regulation violates the language of the statute or is arbitrary and capricious. *See generally Red Lion Broadcasting Co., Inc. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1967); *Udall v. Tallman*, 380 U.S. 1, 16–18, 85 S.Ct. 792, 13 L.Ed.2d 616, *rehearing denied*, 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965). Neither the legislative history of the companion section regarding standardized foods, 21 U.S.C. § 341 (1970) (discussed in the trial court opinion, *supra*, 385 F.Supp. at 365–66) nor the undefined use of "imitation" in the statute leads us to conclude that a food nutritionally equivalent to the ordinary food and clearly labeled with a common name established by regulation or with a descriptive term violates Congressional objectives if it is marketed without the imitation label. Indeed, the new regulation successfully reconciles the need to alert the public to inferior products with the proscription in subsection 343(a) against false or misleading labels. *See generally Armour and Company v. Freeman*, 113 U.S. App.D.C. 37, 304 F.2d 404, 409–14, *cert. denied*, 370 U.S. 920, 82 S.Ct. 1559, 8 L.Ed.2d 500 (1962) (Prettyman, J., concurring) (ham with water added is not "imitation ham" under similar language of Meat Inspection Act of 1907).

As to the arbitrary and capricious issue raised by the Federation of Homemakers, we are convinced that the FDA regulation is well within the zone of reasonableness

---

the name may result in establishing it as a common name. Response to Comments, 38 Fed.Reg. 20703 (1973).

**6.** No standing issue has been raised on this appeal. The court notes *sua sponte*, however, that standing of the Federation of Homemakers was recognized in a similar challenge to a Meat Inspection Act regulation permitting use of an "all meat" label for frankfurters containing 85% meat. *Federation of Homemakers v. Butz, supra* note 1, 466 F.2d at 463–64 n. 3.

**7.** *See* note 1 *supra*.

**8.** In response to criticisms that the new regulation considers only nutritional equivalency, the FDA pointed out that by defining an imitation

as a *substitute*, the characteristics previously noted by courts are still applicable in reaching this threshold finding.

Nutritional inferiority is not the only criterion involved in the defining "imitation" status. An evaluation of the overall impression conveyed by the food must first establish that the food is a substitute for and resembles another food.

Response to Comments, 38 Fed.Reg. 20202 (1973). The FDA went on to say that while taste, smell and appearance may affect whether the food is a substitute, they are too subjective to be the basis for finding a product *inferior*.

required of agency rulemaking. We note first that appellant's primary complaint with the new regulation is that the FDA has not decided to issue standards of identity for all new foods, but instead has promulgated regulations which provide for developing new common names as well as for employing standards of identity and imitation labeling. Under the challenged regulation, a nutritionally equivalent—or perhaps nutritionally superior—food item may still bear the imitation label and a common or standardized name so long as the combination does not mislead the public. Response to Comments, 38 Fed.Reg. 20703 (1973). The manufacturer, however, may choose to use a descriptive label, e. g., "artificially sweetened applesauce;" he may also opt for using a common or usual name and its required labeling. 21 C.F.R. § 102.1(a), (b) (1975) (also promulgated in 1973, 38 Fed. Reg. 6966, and incorporated by reference in section 1.8(e)(2)(ii)). He may establish this common name by everyday use or by petitioning the Commissioner of Food and Drugs to promulgate a regulation prescribing a common or usual name for the food. 21 C.F.R. § 102.2(a) (1975).[9]

This regulatory scheme satisfies prior criticisms that the imitation requirement as interpreted by courts had unduly deterred the development of new food products, desirable for consumers, because the manufacturer's product, even if superior, was subject to the disparagement intimated by the imitation label. See, e. g., Report of Panel III–2; White House Conference on Food and Nutrition, *Final Report* (Dec. 24, 1969); Cody, *New Foods and the Imitation Provisions of the Food, Drug, and Cosmetic Act*, 25 Food Drug Cosm.L.J. 220 (1970); comment, *Imitation Foods: An Emergence from the Twilight Zone*, 13 J.Pub.L. 536 (1964). In addition, the FDA reasonably expects this more flexible approach to encourage greater emphasis on nutritional value and consumer knowledge about purchased food products. *See* Appellee's Br. at 17–20. Furthermore, the regulation provides a safety valve for specific cases arising later in which nutritional equivalency and descriptive labeling do not adequately protect consumers from food substitutes which are inferior in other ways. 21 C.F.R. § 1.8(e)(4)(III) (1975).[10]

This regulation, directed at the laudable aims of encouraging manufacture of nutritional food products and of better informing consumers so that they may exercise a knowledgeable choice of differing foods within general categories, lies well within the bounds of discretion which the FDA may exercise. The judgment of the trial court is hereby

*Affirmed.*

---

9. *See* text of this regulation at note 4 *supra.*

10. This subsection provides:

(iii) If the Commissioner concludes that a food is a substitute for and resembles another food but is inferior to the food imitated for reasons other than those set forth in this paragraph, he may propose appropriate revisions to this regulation or he may propose a separate regulation governing the particular food.

21 C.F.R. § 1.8(e)(4)(iii) (1975).